# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES A. MARKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 06 C 445 |
| | ) | |
| CUSTOM ALUMINUM PRODUCTS, INC., | ) | |
| and JOHN CASTORO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter is before this court on motions by Defendants Custom Aluminum Products, Inc. ("Custom Aluminum") and John Castoro for summary judgment pursuant to Fed. R. Civ. P. 56 and for dismissal pursuant to 28 U.S.C. § 1367(c)(3), and by Plaintiff James A. Marks for partial summary judgment on his assault claims. For the following reasons, all motions are denied in their entirety.

## BACKGROUND

In assembling the recitation of material facts that follows, we have disregarded any alleged facts or purported denials that are unsupported by the record or do not

comply with Local Rule 56.1. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).[1]

Custom Aluminum is an Illinois aluminum extrusion and building products manufacturer. John Castoro ("Castoro") is the Chief Executive Officer and owns approximately 50% of Custom Aluminum's stock. However, Castoro works only 20-25 hours per week, overseeing renewal of the company's insurance policies, office procedures, some inventory matters, and a small part of the purchasing function. Steven Dillett, as President since late 2004, is responsible for overall profitability and long-term positioning structure for the company, and James Castoro, John's father, is chairman.

In 1994, Plaintiff James Marks was hired as a general foreman. Five years later, he was promoted to Plant Manager and held that position until his termination on

---

[1]Two weeks after Defendants filed their reply in support of their motion for summary judgment, Marks filed a motion to strike nearly all of Defendants' responses to Marks' L.R. 56.1 Statement of Additional Facts and parts of Defendants' reply. In this motion, Marks argues that Defendants improperly presented additional evidence in response to Marks' L.R. 56.1 statement. There is nothing improper about the Defendants' citations to new exhibits or facts in their response to Marks' statement of additional material facts. Rule 56.1 requires that denials be supported by the record, and it would be illogical to limit Defendants' denials to only those facts it had previously cited in its Rule 56.1 statement. L.R. 56.1(a); 56.1(b)(3)(B). As to the remainder of Marks' motion, regarding the competency of the evidence proffered in support of Defendants' denials, we will evaluate the evidence presented according to the requirements of Fed. R. Civ. P. 56 and the corresponding local rule.

October 12, 2005. Considerable dispute exists with regard to Marks' role at Custom Aluminum. Defendants contend that Marks' performance as Plant Manager was lacking and that he was kept on solely because of his relationship with Castoro, a characterization with which Marks disagrees.

Both Dillett and James Castoro testified that they felt Marks wasn't performing his duties and they sought to transfer his job responsibilities to other individuals. These changes were noted by Marks, who by late 2004 had become concerned about the reduction in his duties and his future at the company. Notwithstanding this concern, Marks notes that he had not received any negative performance evaluations, that he kept receiving raises, and that Castoro himself thought Marks was doing "a fine job."

The parties also dispute the nature of the friendship between Marks and Castoro. The two men socialized outside of work, played video golf together, and exchanged gifts. At work, they frequently took long lunches together, accompanied by Patrick Breslin, personal assistant to John Castoro. Marks and John Castoro had frequent physical interactions; while Defendants describe this as "playful conduct, such as hitting each other on the arm and giving one another bear hugs," Marks describes it as physical violence inflicted upon him despite his objections and explains that he did what Castoro told him to do, whether personal or professional, out of fear for his job. Although the parties dispute the extent to which Marks acted out of fear of Castoro, it

is undisputed that Castoro owns knives, brought them to work, and on one occasion used a knife to shave the hair off Marks' and Breslin's arms. Castoro also kept a gun in his office because he feared that terminated employees might return. Castoro frequently brought his Rottweiler to work, an animal that terrified several employees at Custom Aluminum and bit at least one deliveryperson. One employee was terminated shortly after complaining about the dog. On one occasion, Castoro brought two Rottweilers to the office and they fought in the hallway, splattering blood on the walls.

The series of events giving rise to this lawsuit began on July 25, 2005, when Marks was injured at work. He filed a workers' compensation claim two days later. Although Marks was usually responsible for handling workers' compensation claims at Custom Aluminum, Dillett did handle some claims and was aware of Marks' claim.

Marks was out of work from August 30 or 31 until September 19, 2005. The pain from this injury was so severe that Marks was admitted to the hospital and treated with "a lot of painkillers." When he returned to work, he was restricted from lifting using the right side of his body and had to attend physical therapy three to four days per week, for about two hours per day beginning at 1 or 1:30 p.m. Marks complained frequently to other employees about the severe pain he suffered. His coworker, Elizabeth Ayala, noted that he looked like he was in pain constantly.

Marks also informed Castoro that Castoro could no longer hit him because of the injury. Castoro denies that Marks ever made such a request, but Breslin, Castoro's personal assistant, also heard Marks telling Castoro not to hit him anymore. Marks complained at least once to Steve Dillett about Castoro hitting him, but Dillett said nothing to either Marks or Castoro. Ayala witnessed Castoro hitting Marks, describing such interaction as "kidding and playing around" in which Marks would tell Castoro not to hit him on his bad (right) arm and offer up his good (left) arm instead. Ayala heard Marks say "ow" on the occasions he was hit.

Upon Marks' return, Castoro made comments to Marks such as "you've got a bad flipper," "you're no longer fun" "you're no good to me," and "I won't have my lunch buddy anymore." Marks alleges, but Castoro denies, that he described Marks as "damaged goods." While Marks says that such comments made him think that his job was on the line over his going to therapy, Castoro claims that he was simply hurt that Marks could not go to lunch regularly, or if he was able to attend, could not drink or play video games as they had once done.

On October 4, 2005, Dillett and James Castoro met with Marks to provide him with new job responsibilities, a move Defendants explain as an attempt to keep Marks on because of his friendship with Castoro. This new job description did not include some of Marks' prior job responsibilities.

On Friday, October 7, 2005, John Castoro hit Marks on his uninjured arm twice. The first time, Marks alleges that the blow hurt him so badly that he went down to his knees in pain, and asked Castoro to stop hitting him. The second time Castoro hit him, Marks responded by slapping Castoro on the head - an action Castoro testified he understood to mean that Marks didn't want Castoro to hit him anymore. Castoro admits only that he "slapped" Marks on his left arm twice. Marks apologized to Castoro for hitting him, and later that day, told Dillett about the incident. Dillett took no action against Castoro or Marks.

On Monday morning, October 10, Castoro entered Marks' office where Marks was discussing plans for the Christmas party with Ayala. According to Castoro, he "greeted" Marks by "slapping" his left (uninjured) arm. Marks responded by swearing at Castoro and throwing a pen. Castoro claims the pen was directed at him but Marks says he threw it on his desk and the pen ricocheted to hit Castoro. Castoro responded by telling Marks to leave; he also said Marks should take some time off and suggested that he might not need to come back at all. Castoro had the authority to fire employees and had done so in the past by sending the employee home in the middle of the day. Accordingly, Marks left, believing that he had been fired.

Shortly thereafter, Castoro was advised that the company had received a call from "an insurance person, maybe a workers' compensation person" who inquired as

to Marks' employment status, having learned that Marks was terminated. Castoro then shut off Marks' company cell phone service and changed the locks on his office door.

On the afternoon of October 10, Marks contacted Dillett and James Castoro and told them of that morning's incident with Castoro. Marks told Dillett that Castoro had hit him and that "if he didn't take care of it, [he would] have no other option other than to go to the police." At this point, both Dillett and James Castoro believed that Marks had filed the police report.

At 7 a.m. on Tuesday, October 11, Marks met with Castoro and another manager. Castoro began the meeting by apologizing for hitting Marks. Marks asked Castoro whether his employment was terminated, and Castoro said no. Castoro asked Marks whether his reaction to the incident the prior morning was prompted by other problems Marks was having or any medication he might be taking. Marks responded that the problem was not his medication but instead that "this is about you hitting me." Marks claims that he told Castoro he had filed a police report concerning the previous day's incident. After this meeting, Castoro states that he decided to "take himself out of the decision-making" and turn the issue over to Dillett.

At 9 a.m. that same morning, Marks met with Dillett. The parties differ on what precisely was said, but the general gist of the conversation is that Marks told Dillett that Castoro came into his office and hit him, and that he was very frustrated with

Castoro for hitting him after he asked him not to do so. Dillett then advised Marks that he needed to investigate, suspended Marks with pay, and interviewed Castoro and Ayala regarding the incident. At some point that day, Dillett called the South Elgin Police Department for extra security and the officer responding advised Dillett that Marks had gone to the police to report that Castoro had hit him. However, the police declined to accept his complaint because Marks was not injured and had admitted that he had also hit Castoro. At 3 p.m., Dillett left a message for Marks, telling him to come in at 9 a.m. the next day for a meeting. That evening, Castoro spoke to Dillett, who informed him that they intended to fire Marks.

On the morning of October 12, Marks met with Dillett and John Castoro. According to Dillett, he sought to determine whether Marks and John Castoro would be able to work together and come to an amiable understanding of their reactions during the October 10 incident. However, the events of October 10 were not the only topic of the meeting - Marks alleges that Dillett and Castoro accused him of having another employee falsify a document, but Dillett claims he only asked him whether or not he had an employee withhold a document from the Fox River Water Reclamation District. During this meeting, Marks did not express any remorse or provide any explanation for his conduct on October 10.

The parties' testimony raises questions as to who was involved in the decision to fire Marks. Dillett claimed that he discussed the possibility of terminating Marks with others, but that it was his decision to fire Marks. James Castoro claims that it was his decision to terminate Marks and that Dillett implemented the decision. However, Dillett explains that if Marks had shown some remorse or explained his conduct at the meeting on October 12, his employment would not have been terminated.

Marks alleges that he was treated differently from similarly situated employees who were not disciplined for cursing or hitting, such as Gary Moss, production manager, who swore at Bill Petterson, another manager. Moss was not terminated, but Marks alleges that Petterson was terminated for complaining regarding Moss's conduct. Marks also points to Patrick Breslin and Vince Castoro, who have sworn at and hit Castoro but have not been terminated or otherwise disciplined. Marks also claims that Dillett questioned the employment of three individuals, Bob Christensen, Javier Perez, and Howard Lake, after they filed workers' compensation claims - an accusation Dillett denies. Marks alleges that Christiansen was fired after he took time off for an on-the-job injury, an allegation James Castoro denies, explaining instead that Christiansen was fired because he refused to perform a job duty-washing windows-that James Castoro asked him to perform as a personal favor.

In January 2006, Marks filed a four-count complaint in this court. Count I alleges that Defendants Custom Aluminum and John Castoro terminated Marks in retaliation for taking leave pursuant to the Family and Medical Leave Act ("FMLA"). Count II alleges that Defendant Custom Aluminum terminated Marks in retaliation for filing a claim under the Illinois Workers' Compensation Act and in retaliation for filing a police report against John Castoro. Counts III and IV allege that Defendant John Castoro committed an assault and battery against Marks. Defendants now move for summary judgment as to Counts I and II and move to dismiss Counts III and IV pursuant to 28 U.S.C. § 1367(c)(3).

## LEGAL STANDARD

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record, at which time the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant." *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). At summary judgment, we construe all facts and draw all inferences from the record in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

### I.    FMLA Retaliation Claim

Marks alleges that he was terminated in retaliation for taking leave from work pursuant to the FMLA, 29 U.S.C. § 2601 *et seq,* which permits eligible employees to take up to 12 weeks of leave on account of, *inter alia*, a serious health condition.  29 U.S.C. § 2612.  The FMLA prohibits employers from discharging or in any way discriminating against individuals for exercising their rights under the FMLA.  29 U.S.C. § 2615(a)(2).  In order to survive summary judgment on his claim of FMLA retaliation, Marks may rely on the same direct or indirect methods of proof used in other employment discrimination cases.  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

Under the direct method of proof, the plaintiff must show that (1) he engaged in a statutorily protected activity, (2) that the defendant subjected him to an adverse

employment action and (3) that a causal connection exists between the two events. *Treadwell v. Office of Ill. Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006). The direct method can be supported either with direct evidence (such as an admission of a causal connection) or circumstantial evidence (evidence giving rise to the inference that there is a causal connection). *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902 (7th Cir. 2006).

As Defendants have conceded for the purposes of this motion that Marks' leave was protected by the FMLA and his termination is indisputably an adverse employment action, Marks need only show that there was a causal link between his FMLA leave and his termination. According to Defendants, the fact that Marks was discharged while he was taking FMLA leave is mere coincidence. Instead, Defendants specifically assert, citing the testimony of Castoro and Dillett, that the motivating reason behind Marks' termination was his refusal to explain or apologize for swearing and throwing a pen at Castoro.

In response, Marks proffers circumstantial evidence which he contends gives rise to an inference that he was fired because he took FMLA leave. Specifically, Marks cites the timing of his discharge, Castoro's anger with respect to his inability to go to lunch as a result of his FMLA leave, and the pretextual nature of Defendants' explanation for his termination.

First, Marks points to the timing of his termination, which occurred less than a month after his return to work after an extended period of leave and while he was taking intermittent leave for physical therapy. Suspicious timing is a type of circumstantial evidence that may be employed as part of the direct method of proof. *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003). While Marks' termination occurred within a month after he returned from FMLA leave and while he was taking intermittent leave, the fact that his FMLA leave preceded his termination does not prove that the first event caused the second. *Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744, 758-59 (7th Cir. 2006). However, timing can be considered where the record reflects other evidence that reasonably suggests that the protected activities were related to his employer's discrimination. *Burks*, 464 F.3d at 759.

Marks does not rely on suspicious timing alone; he also offers the statements of John Castoro, whom he alleges was involved in the decision to fire him. Although Dillett, not Castoro, actually terminated Marks, the derogatory comments of one who provides input or influences the termination decision may be considered "if that individual expresses such feelings around the time of, and in reference to, the adverse employment action complained of." *Hemsworth v. Quotesmith.Com, Inc.* 476 F.3d

487, 491 (7th Cir. 2007); *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000).

As an initial matter, a jury could reasonably conclude that Castoro had input or influence upon the decision. Although Defendants argue that because John Castoro "deliberately removed himself" from the role of decision-making, a jury could conclude that Castoro nonetheless provided input into Marks' termination because he is the CEO of Custom Aluminum, sent Marks home on the 10th, held a meeting with Marks on the 11th to discuss the previous day's incident, had fired employees, and was responsible for cancelling Marks' cell phone and changing the locks on the office door. Even after he allegedly "removed himself" from the decision-making process, he discussed Marks' termination with Dillett and attended the meeting on the morning of October 12 at which Marks was terminated.

As to the nature and timing of the comments themselves, the record shows that on several occasions Castoro told Marks that "you've got a bad flipper," "you're damaged goods," "you're no good to me," and "I won't have my lunch buddy anymore" in the month between Marks' return to work and his termination. Comments that speak directly to Marks' injury such as "you're damaged goods" and the comment "you're no good to me" could be reasonably construed as being related to Marks' termination. As such, these comments could support an inference of retaliation even

though they were not made immediately prior to the termination. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000) (where comments were made within three or four months of the action, a jury could find a causal nexus); *Volovsek*, 344 F.3d at 690 (noting that derogatory remarks that are "close in time and in substance to the alleged act" can preclude summary judgment because whether the statements were actually made and their import is for the jury to decide). Accordingly, a jury could reasonably conclude that Castoro, angered by Marks' need to take FMLA leave, influenced the decision to terminate him.

Finally, Marks points to evidence that he contends calls into question the veracity of Custom Aluminum's stated reason for firing him. Although this type of evidence bears an "eerie similarity" to evidence proffered under the indirect method of proof, *id.*, a plaintiff who establishes evidence of a causal connection between her protected activity and her termination need not also show that the employer's stated reason for termination is pretextual; that is a question for the jury. *Stone,* 281 F.3d at 643. *See also Sylvester*, 453 F.3d at 905. Marks first argues that the behavior for which he was purportedly fired - swearing and throwing a pen at Castoro - was tolerated as a general rule at Custom Aluminum, pointing to evidence that horseplay was common, as well as evidence that at least one other employee, Moss, who cursed at a fellow manager was not disciplined or fired. There is no evidence as to whether

or not Moss apologized for his conduct. In addition, Marks contends that Defendants' explanation for his termination is internally inconsistent. While Defendants argue that it was not Marks' actions, but his failure to show any remorse, that persuaded Dillett to terminate his employment during the October 12 meeting, this assertion is inconsistent with Castoro's testimony that the decision was made the night prior to the meeting, and James Castoro's testimony that he decided to fire Marks and Dillett implemented his decision. Given this evidence, a reasonable jury might conclude that Marks' conduct was not unusual, and that the stated reason for his termination was nothing more than an excuse because Defendants had intended to terminate Marks regardless of whether or not he apologized for his conduct.

After examining the evidence proffered, we conclude that a genuine dispute concerning the material facts surrounding Marks' termination exists. Drawing all inferences in favor of nonmovant Marks, a jury could reasonably conclude that it was Marks' use of FMLA leave that prompted his termination, and not a relatively minor confrontation in the office. As we have concluded that Marks has presented sufficient circumstantial evidence to give rise to a conclusion that his termination was caused by his exercise of his FMLA rights, we need not examine the evidence profferred using the indirect method of proof. Accordingly, summary judgment is denied on Count I of Marks' complaint.

## II.     Retaliatory Discharge Claims

### A. Retaliation for Filing a Workers' Compensation Claim

Marks claims that Defendants unlawfully fired him for filing a workers' compensation claim.  Although the general rule in Illinois is that an employer may terminate an at-will employee for any reason or no reason at all, the Illinois Supreme Court recognizes a limited cause of action for retaliatory discharge when employees allege that they were fired for filing a worker's compensation claim.  *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357 (Ill. 1978).  This exception is premised upon the court's conclusion that the public policy underlying the Workers' Compensation Act would be undermined if employers were allowed to discharge or threaten to discharge employees who sought relief under the Act.  *Id*.

The Illinois Workers' Compensation Act ("the Act") makes it unlawful for an employer to retaliate against employees for exercising rights or remedies granted by the Act.  *See* 820 ILCS 305/4(h).  In order to establish a claim for retaliatory discharge based upon the filing of a workers' compensation claim, an employee must prove (1) that he was an employee before the injury; (2) that he exercised a right granted by the Act; and (3) that his discharge was causally related to his exercise of that right. *Clemons v. Mechanical Devices Co.*, 704 N.E.2d 403, 406 (Ill. 1998).  The ultimate issue in a retaliatory discharge case is the motive of the employer. *Hartlein v. Illinois*

*Power Co.*, 601 N.E.2d 720, 730 (Ill. 1992). If the employer has a valid, non-pretextual reason for discharging the employee, he cannot be held liable for retaliatory discharge. *Id.* at 728. The plaintiff bears the burden of proof on all elements of his claim, and although the employer may supply a non-discriminatory reason for the discharge, he or she is not required to do so. *Clemons*, 704 N.E.2d at 406.

In this case, the parties agree that Marks was an employee of Custom Aluminum prior to his injury and that he exercised a right granted by the Workers' Compensation Act. Accordingly, the only issue we need to examine is whether Marks' termination was caused by his refusal to apologize for the events of October 10 or by his filing of a workers' compensation claim. Marks offers both circumstantial evidence and what he contends is a direct admission by Castoro in support of his argument that his firing was caused by his contact with workers' compensation representative. First, Marks points to Castoro's reaction after learning that Marks had filed a workers' compensation claim: by immediately shutting off Marks' cell phone and changing the locks on Marks' office door, Marks contends Castoro showed that he was so angered by Marks' filing of a claim as to take steps which could only be construed as steps of termination. The remainder of Marks' proffered evidence of a causal connection is circumstantial. Marks suggests that his filing of a workers' compensation claim was the reason he was terminated, pointing first to Dillett's alleged comments questioning

the continued employment of employees who filed workers' compensation claims. While Defendants argue that Marks was regularly involved in handling workers' compensation claims, Dillett was at least aware that Marks had filed a claim. Marks also points to a similarly situated employee, Christiansen, whom he claims was fired because he filed a workers' compensation claim, a contention that James Castoro denies.

Defendants maintain that Marks' refusal to apologize for throwing a pen and cursing at Castoro was a clear, legitimate, and non-retaliatory reason for terminating Marks' employment. For the reasons stated above with respect to Marks' FMLA retaliation claim, however, the evidence surrounding the decision to terminate Marks is sufficiently unclear to raise a question of fact as to whether or not the stated reason for Marks' termination is pretextual.

Marks has proffered sufficient evidence from which a reasonable jury could conclude that his workers' compensation claim was causally related to his discharge. Accordingly, summary judgment as to Marks' Illinois Workers' Compensation retaliation claim is denied.

## B. Retaliation for Filing a Police Report

Marks also claims that his termination was motivated by his attempt to file a police report concerning the incident with Castoro, and that such a termination is in

violation of public policy. The tort of retaliatory discharge, while narrow, is not limited solely to discharge for filing a workers' compensation claim; instead, in *Palmateer v. International Harvester Co.,* the Illinois Supreme Court expanded the tort of retaliatory discharge to include discharges in violation of public policy. 421 N.E.2d 876, 879 (Ill. 1981). To establish a claim for retaliatory discharge, a plaintiff must show that (1) he was discharged in retaliation for his activities; and (2) the discharge is in contravention of a clearly mandated public policy. *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 493.

The Illinois Supreme Court has so far limited its "public policy" exception to protect workers' compensation claimants and employees who report illegal or improper conduct on the part of their employer. *Id.* In determining whether or not a discharge violates public policy, the court balances the respective interests of the employer, employee, and society. *See Jacobson*, 706 N.E.2d at 493-94 (declining to find a cause of action for retaliatory discharge where another governing body exists to address alleged misconduct); *Barr v. Kelso-Burnett Co.*, 478 N.E.2d 1354, 1356 (Ill. 1985) (no retaliatory discharge cause of action for employee exercising free speech because the public policy behind such rights limits abridgment by the government, not employers); *Price v. Carmack Datsun, Inc.*, 485 N.E.2d 359, 361 (Ill. 1985) (no retaliatory discharge cause of action for employee who filed insurance claim because claim was

a private contract and did not implicate a clearly mandated public policy); *Wheeler v. Caterpillar Tractor Co.*, 485 N.E.2d 372, 374 (Ill. 1985) (recognizing retaliatory discharge action for employee who refused to handle radioactive material as part of job duty where defendant operated in violation of Nuclear Regulatory Commission Rules). These decisions demonstrate that an Illinois court is likely to find a discharge in violation of public policy when, absent the remedy of a cause of action for retaliatory discharge, an employer would be otherwise free to coerce employees into ignoring their duties, rights, and responsibilities as a citizen to the detriment of society at large.

As with Marks' other claims of retaliation discussed above, the only issue in dispute is whether or not the fact that he reported Castoro's conduct to the police caused his termination. First, we must determine whether or not discharging an employee for filing a complaint related to a physical altercation at work violates Illinois public policy. The Illinois Supreme Court has not yet spoken to this precise issue. However, in *Palmateer*, the Illinois Supreme Court held that the enforcement of a State's criminal code is "implicit in the concept of ordered liberty" and that "there is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." *Palmateer*, 421 N.E.2d. at 879-80. Noting that public policy favors the exposure of crime, the court held that persons acting in good faith and with probable cause to believe a crime has been

committed should not be deterred from reporting them by the fear of being wrongfully discharged. *Id.* at 880. Furthermore, the court emphasized that the magnitude of the crime is of no matter, so long as the Illinois General Assembly had deemed the action to be a crime. *Id.* Given the Illinois Supreme Court's articulation of public policy with respect to the reporting of crime, we believe that Marks' filing of a battery claim against his employer is consistent with the public policy "favoring investigation and prosecution of criminal offenses." *Id.; see also Daoust v. Abbott Laboratories*, 2007 WL 118414, *5 (N.D. Ill., Jan. 11, 2007) (finding that retaliation for reporting workplace violence to the authorities would contravene Illinois's efforts to create and protect its citizens). Accordingly, discharge in retaliation for filing a police report in this instance would be a discharge in violation of public policy.

Marks points to the timing of his attempt to file a police report, and Castoro and Dillett learning of the same, as probative of a causal connection between the filing of the report and his discharge. The South Elgin police alerted Custom Aluminum to Marks' complaint on the evening of October 11, and Marks was terminated the following morning. This evidence, combined with evidence discussed above concerning the validity of Custom Aluminum's stated reason for terminating Marks, persuades us that a jury must determine whose version of the facts to believe.

Therefore, Defendants' motion for summary judgment as to Marks' police complaint retaliation charge is denied.

## III.    Assault and Battery Claims

As we have denied summary judgment on Marks' federal claims, we decline to grant Defendants' request that we dismiss Marks' assault and battery claims pursuant to 28 U.S.C. § 1367(c).  In his response to Defendants' motion for summary judgment, Marks suggested that summary judgment on the assault and battery claims in his favor is appropriate because Castoro admitted to hitting Marks despite his requests that Castoro stop.

Under Illinois law, a battery results when the defendant (1) intended to cause a harmful or offensive contact; and (2) a harmful or offensive contact resulted. *E.g. Happel v. Wal-Mart Stores, Inc.*, 737 N.E.2d 650, 657 (Ill. App. Ct. 2000).  Contact is "offensive" when it is made without consent, *Kling v. Landry*, 686 N.E.2d 33,  41 (Ill. App. Ct. 1997), and need not result in serious injury so long as the contact "offends a reasonable sense of personal dignity." *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill. App. Ct. 1995).  Assault is the "reasonable apprehension of an imminent battery." *E.g. Rosenberg v. Packerland Packing Co., Inc*., 370 N.E.2d 1235, 1238 (Ill. App. Ct. 1977).

As to both counts, the record is not quite as clear as Marks believes it to be. Instead, as Defendants point out, questions of fact exist as to whether or not Castoro "hit" Marks, as Marks alleges, or as Castoro testified, "tapped" Marks on the arm, and whether Marks told Castoro to stop. In addition, an issue of fact remains as to whether not Marks consented to the touching. Summary judgment on Marks' assault and battery claims is therefore inappropriate.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment and motion to dismiss are denied. Marks' motion for partial summary judgment and his motion to strike portions of Defendants' reply in support of their motion are also denied.

Charles P. Kocoras
United States District Judge

Dated:  July 5, 2007